## JOHNSON *v.* JOHNSON.

### Opinion delivered March 3, 1913.

1. DIVORCE—CONFLICTING TESTIMONY—BURDEN OF PROOF.—In an action for divorce for desertion and intolerable treatment, when the testimony is conflicting, the burden of proof is upon plaintiff, and conflicts between the testimony of the parties must be resolved in favor of the defendant.    (Page 271.)

2. DIVORCE—WILFUL DESERTION—CONSENT.—Desertion as a ground for divorce must be without consent and against the will of the complainant, and a husband will not be held to have deserted his wife when she acquiesced in the separation, and did much to bring it about, no matter how long continued the separation may be.    (Page 271.)

Appeal from Sebastian Chancery Court, Fort Smith District; *J. V. Bourland,* Chancellor; affirmed.

### STATEMENT BY THE COURT.

The appellant, Mrs. Johnson, brought this suit against her husband for divorce, alleging wilful desertion for more than one year and such indignities as to render her life intolerable. She alleged that there were two children of the marriage, Ann T., two years of age, and Augusta, six years of age, and that appellee had wholly failed to provide for them. She prayed for absolute divorce, alimony and suit money. The complaint was filed on the 4th day of May, 1912.

The appellee denied the material allegations of the complaint, and alleged that he had been a loving and devoted husband; had kept his marriage vows, and had endeavored in every way possible to add to the happiness of the appellant; that for some reason unknown to him the appellant, prior to January 18, 1911, abandoned his bed and has ever since refused to cohabit with him as his wife and ever since preserved this attitude. He averred his willingness to have resumed the marriage relations with plaintiff if she had shown a disposition to treat him as a husband and was still willing, on that condition, to resume the marriage relations with her.

Appellee admitted that he had not contributed to the support of the children since the separation, but alleged that he and his mother had given them clothing and had endeavored to look after them; that the reason he had not contributed to the support of the children was that they were given to the appellant upon representations to the court that appellant's father was amply able and willing to provide for them, and alleged that he had only been allowed to see his children at stated intervals since appellant was entrusted with their custody, and that he had not had an opportunity to enjoy their society as a father should. He alleged that he would be glad to support, care for and educate them if the children were given to him.

The appellant was the daughter of Mr. Smith, a gen-

tleman of considerable means, who lived in the city of Fort Smith. Appellant was traveling in California for the benefit of her health. Appellee was a traveling salesman in California. He met the appellant there and became infatuated with her, and she received his attentions favorably, and they were engaged to marry. Appellee at the time was living with his mother. He was receiving about $125 per month as compensation for his services as traveling salesman. The appellee owed $800 for money borrowed to purchase stock in the wholesale drug house for which he was working. Appellee stated his financial condition to his fiance and he desired to postpone their marriage until he could get out of debt. Appellant was unwilling to this, and she wrote appellee the following letter:

"Sweetheart: Two letters from you today crashing our vacation scheme. My mind has been working at a furious rate ever since the receipt of the first one. November means no visit for I am sure he can not spare you when the holiday trade is at its heaviest. I have thought of everything, devised all sorts of schemes and this one seems to cling to me. Think it over. Get off for a few days while the rates are on and come to me and let us be immediately married and take me back with you. You say you can give me no comforts. I am sure I would not have to rough any more than the winter I spent in California, besides I care nothing for that—absolutely nothing. My inner life is the active one. Life isn't long enough to dally this way. I think if we make an effort to be agreeable to each other that we can live comfortably together. In this way your trip will not be any more expensive than as you had planned it. If you haven't the money borrow it; there are worse things than debt in the world; my father was in debt when he married and no prospects. We can borrow money from him to pay out that Braun stock; you can stay on the road until a good opening offers itself. We can manage some way. The main thing will be accomplished. We will be together and together I believe we can accomplish

more than apart. I am dreadfully afraid we will postpone this until it is too late. Besides two years from now you will find yourself as little ready as at present. I am not much on living in the tomorrow. I believe this coming winter would be more pleasant were we together, even under unpleasant circumstances. Perhaps there is some objection to this which I know nothing of; at any rate I ask you to think seriously of it.''

Appellee immediately responded to this letter, asking appellant if she would marry him if he would come to Fort Smith, and she replied that she would. He went to Fort Smith and they were married. After a visit to the East they went back to California and lived at first with appellee's mother. After a time the relations between the mother of appellee and his wife became strained and as a result appellant left Mrs. Johnson's home, and appellee assented to this arrangement. Appellant's father and mother visited her in California. At that time appellant was nearing confinement and she became anxious to move back to her home in Arkansas. Her father and mother were also anxious for this, and appellant's father offered appellee employment at a salary beginning with $75 per month, which was to be increased to $150 per month. The result was that appellant and appellee moved to Fort Smith and lived with appellant's parents for nearly a year.

Appellee entered upon his work in the bank and insurance company at a salary of $75 per month, which was afterwards increased to $150 per month.

Without going into details, appellant claims that her father made contributions to appellee amounting in the aggregate to $9,700, and that upon the whole he was ''an expensive son-in-law;'' that after the birth of the second child they were in ''quite impoverished circumstances;'' that on account thereof it became necessary for appellant ''to go to work to help to make a living for the family and to pay the household expenses which appellee at that time was unable to do; that on account of these things she resolved that ''she would have no fur-

ther sexual relations with him," as she did not think it right to herself to bring other children into the world when she was unable to support those they had. Having lost confidence in him as a man and whatever affection, if any, she had for him, she determined to alter the relations that she had theretofore sustained to him, as evidenced by the following letter, written by her to appellee on August 3, 1910:

"Dear Jilson: Your request for an explanation is only just I suppose—only there is little to explain. When I married you I knew I did not love you but there was very small chance of my ever loving any man and I believed I would come nearer realizing my ideal husband and father in you than any man I had ever known and believed of course love would follow. I have no criticism to offer of you as a husband and father unless it is that you are too self-sacrificing, but I have learned this thing that love can not be coaxed, wheedled or forced. For six years I have sincerely tried to care for you; the nine months previous to the birth of the babe was a time of awakening. I realized the futility of my efforts and our relations have all the time become more and more distasteful until they border on torture. I am sorry for you, but I absolutely can not help it. It seems to me the only kind thing you can do is to alter our relations—a few words can not make a woman a slave of a man when a woman gives her body to a man she feels towards as I do towards you it is nothing short of adultery. I ask you to desist from caressing me. Of course, you can do as you choose with your life—I give you every liberty, and ask the same in return, but please do not force yourself on me. I would suggest that we continue as we are now living, dropping the relation of husband and wife, unless you have some more pleasant course in view for yourself. Now please accept this as a man—do not come to me crying and scolding; it can avail nothing, and it is quite as hard on me as it is on you. I ask you to face it as I do—try to be happy. I would will things otherwise were it possible." (Signed) "Bird."

In explanation of this letter, appellant testified that the occasion of it was her refusing to let appellee kiss her. He had become distasteful to her. She didn't love him when she married him. In regard to the statement about his being too self-sacrificing, she says she must have referred to the children in that, as she had nearly all of the correcting to do; that he didn't take the stand as a father should to command their respect. In regard to the statement that she would give him every liberty and ask the same in return, she says she meant the liberty of living in all the little things of life, her going and coming and his going and coming. This letter was intended to cut off all sexual relations of husband and wife between her and Mr. Johnson; that was its object. Her proposition was that they should occupy the same house but separate rooms or beds and live in that way and raise the children and make as pleasant a home as they could for the children.

In explaining why she said she lost confidence in his ability and respect for his character she gives the following reasons: He had not made a success. She was forced to go out and work. They were owing money all over town, and this was the only way she had to judge of his ability. So far as his character was concerned, she ceased to consider him an honest man. This opinion was caused by many small things. One was her father had offered him $5 to stop smoking cigarettes and he took the money and continued to smoke them. Another was that he had failed to turn over mining stock that her father had given him for her. These were the two principal things, but a thousand little things in every day life caused her to size him up in this way. She didn't give these reasons in her letter to him because she intended to give the one most forceful with him. In the letter she tried to shield him. "In fact," she says, "I think I laid it on pretty thick in trying to shield the blow." Notwithstanding she thought him inefficient and dishonest, she was willing to live with him in the same house and to all appearances as husband and wife, notwith-

standing his faults of character, in order to raise the children and avoid the disgrace of their separation, but she was unwilling to assume the sexual relation of husband and wife.

The appellant was asked whether or not she disliked her husband very much and answered: "My feeling is pretty largely one of indifference." If he should make advances "my feelings would be decidedly dislike."

The appellee claims, and his testimony tended to show, that out of the gifts he had received from Mr. Smith, the father of appellant, and out of his salary, he had expended over $8,000 on the lots which Smith had given appellee's wife for a home; that all that he had earned aside from the necessary support of his family had gone into improvements on this property, and that the same was then worth the sum of $12,545, and was in the name of appellant.

He borrowed $2,500 on his wife's property with which he purchased an interest in a furniture business. The net worth of the business is from $2,500 to $3,000. He has a half interest in it.

He explained the mining transaction by saying that "when the mining company was organized Smith was given $25,000 stock," and gave him (appellee) $12,500. The stock had not cost Smith anything. He (appellee) transferred sixty-five shares to his wife, ten shares to his partner and sold two shares. His wife wanted him to transfer all of the stock to her and because he would not do so she seriously objected. Mr. Smith didn't seem to object much. Appellee didn't regard the mining stock as of any value.

In regard to the cigarette transaction, he testified that Smith gave him $5 to throw away a cigarette which he was then smoking and he did so and called on him for the $5 and got it, and it passed off as a joke. He told his wife about it and they thought it was a good joke. Another witness who saw the cigarette incident testified that he considered it a joke.

The testimony of appellee tended to show that he

had never mistreated his wife, and witnesses testified to his good habits and to the cordial relations that seemed to have existed between appellee and Smith, appellant's father, and also to the apparently pleasant relations that existed between appellee and his wife.

It is unnecessary to set out this testimony in detail. His version of his demeanor towards his wife and his affection for her before and after he received the letter of August 3, 1910, is shown by the following excerpt from his testimony: "I tried to talk to her time and time again and to reason with her, and tried to find out why she treated me as she did, and she always said 'I don't care to discuss it,' and got up and left the room, and I tried several times, and in August, it was in the afternoon, I was going by there and I saw her in the sitting room with the baby and thought I would go in and reason with her and try to find out the trouble, and she said she didn't care to discuss it and I insisted a little. I told her that I thought it was just to me that she should explain to me; if I had done anything to give me a chance to explain, and she said, 'Go down town this minute; obey me and go down town this minute.' Then it went on until the 1st of January, 1911, and I was holding the baby, our youngest baby, while she (appellant) was bathing and getting ready for bed. When she came in for the baby, why, I said, 'Precious, this is the first of the year, and we can't go on living like this; let us talk this thing over, and get it straightened out and live right.' She grabbed the baby and said, 'I don't care to discuss it,' and ran into her own room. I hoped and hoped until January 18, when I left there."

When asked what he did after receiving the letter and whether he attempted to "make up with her" after that, he replied: "It went on just the same and I never spoke to her about it until a day or two after that I referred to it and told her that we were man and wife, both in the eyes of God and the laws of the land, and nothing could ever make me believe that our children were born in adultery. 'Well,' she said, 'I am not so

sure of that.' It went on until the 18th of January. I just put it off, hoping and hoping, and finally I left. I tried to talk with her; that last time was on January 1. I tried every now and then. I tried to go to her and talk to her and reason with her and see if we couldn't get together and it was absolutely impossible; she wouldn't listen to me.''

Appellee was asked, ''What were your feelings towards your wife up to the time of your separation?'' and answered: ''I don't see how a man could think more of his wife than I did because my whole life was for the benefit of my wife and children, and my wife I held paramount even to my children. · I thought it was strange when the question came up something about whether we had rather give up first our husband or our children, and I says, why, if there was any deciding to be done and I had to give either my wife or my children by death and couldn't keep both of them, I would prefer to keep my wife more than anything. I would give up the children, and I believe everybody else would feel the same way, and she said, 'I don't know; I think I would give up my husband.' ''

The court dismissed appellant's complaint for want of equity, and she duly prosecutes this appeal.

*Hill, Brizzolara & Fitzhugh,* for appellant.

Abandonment and desertion by the husband for more than one year constituted grounds for divorce under our statutes.

The withdrawal of the marital relation is not ground for abandonment and desertion. 50 So. Rep. 867; 68 S. E. 73; 129 N. W.; 68 S. E. 381; 110 N. W. 618; 56 Atl. 86. Brown on Divorce, 153; 21 N. J. Eq. 331; 78 Me. 548; 23 Pa. St. 343; 52 N. J. Eq. 349; Andrews on American Law, Vol. 1, p. 632; 138 Ill. 436; 14 Cyc. 612; 9 Am. & Eng. Enc. of Law (2 ed.), 769.

The testimony wholly fails to show any dereliction of wifely duly except her refusal of the connubial bed.

*Read & McDonough,* for appellee.

The testimony adduced on the part of appellant wholly fails to show statutory grounds for a divorce. 52 N. J. Eq. 349; 44 Ark. 429; Am. & Eng. Enc. of Law, Vol. 9, p. 773.

When there is conflict in the testimony that of the defendant has the greater weight.   34 Ark. 37.

WOOD, J., (after stating the facts).   After the statement of facts, but little more need be said.   It may be conceded that according to the decided weight of authority, a refusal by one spouse to have sexual intercourse with the other is not willful desertion and does not generally, under statutes like ours, constitute grounds of divorce.   But that is not the question for our consideration.   Appellee is not seeking a divorce from appellant upon such grounds.   The question presented by this record is whether or not appellant has established a right to divorce upon the ground that appellee has willfully deserted her, or offered her such indignities as to render her condition in life intolerable.   The chancellor found that "neither the leaving nor absence was willful upon the part of the defendant;" that "it was not only provoked by plaintiff, but consented to by her."   The chancellor was correct in these findings.   The burden of proof was upon appellant, and any conflicts between her testimony and appellee's must be resolved in favor of the latter.   *Rie* v. *Rie,* 34 Ark. 37.

The principles announced by this court in *Rigsby* v. *Rigsby,* 82 Ark. 278, when applied to the facts of this record, show that there was no willful desertion of appellant by appellee.   See 9 Am. & Eng. Enc. of Law, 223. Where the separation is by consent, there can not be willful desertion.   *Reed* v. *Reed,* 62 Ark. 611.   It is held in *Hankinson* v. *Hankinson,* 33 N. J. Eq. 66, that "the separation of a husband and wife, acquiesced in by the wife, and which she did much to bring about, however long continued, does not constitute desertion to authorize a divorce" on the wife's petition.   "Desertion must be without the consent and against the will of complain-

ant.'' *Sergent* v. *Sergent,* 33 N. J. Eq. 204. The separation here was plainly not against the will of appellant as shown by her letter òf August 3, 1910.

The opinion might be extended at length *(arguendo)* in discussing the facts. But inasmuch as the divorce can not be granted, and as nothing could be said in commendation, justification, or even extenuation of the conduct of appellant towards appellee, the least said the better.

Affirmed.